**Richard William GOODYEAR, Defendant below, Appellant,**

v.

**STATE of Delaware, Plaintiff below, Appellee.**

Supreme Court of Delaware.

Argued Sept. 8, 1975.

Decided Oct. 21, 1975.

Arlen B. Mekler and Roger A. Hines, Asst. Public Defenders, for defendant below, appellant.

George H. Seitz, III, State Prosecutor, and Howard F. Hillis, Deputy Atty. Gen., for plaintiff below, appellee.

Before HERRMANN, Chief Justice, DUFFY and McNEILLY, Justices.

DUFFY, Justice:

In this appeal from convictions for rape, 11 Del.C. § 781, and burglary in the first degree, 11 Del.C. § 392, defendant argues that: (1) the admission of certain eyewitness testimony violated his right to due process of law; (2) a pre-trial confrontation was arranged in violation of his constitutional rights; (3) the evidence was insufficient to support the convictions; and (4) publicity during the trial had a prejudicial effect on the jury. We consider them in that order but, first, the facts must be stated in some detail.

I

It is undisputed that, at an early morning hour on January 4, 1972 after the victim's husband had left for work, she was raped by an intruder while in bed in her ground-floor apartment. She had been awakened by the assailant who put a knife at her neck, threatened to kill her and her baby and then put a blanket over her head. She gave the police a description of the rapist and later the same day examined about 125 "mug shots" without identifying him. For about two weeks after the attack the victim and her husband stayed with friends in Wilmington. At about 5 A.M. on a morning shortly after their return, the victim was in her car with the baby preparing to drive from her apartment to a friend's home. She saw a man standing

inside the entryway of the apartment building next to hers and looking through a glass panel beside the door. She identified him as the rapist. She repeatedly blew the car horn to attract her husband's attention but he had already left for work. The man turned and ran up an inside stairway.

Some four months later a detective learned that defendant, who was being held in default of bail on an unrelated charge, had lived with his wife and child in the same apartment complex with the victim but in a separate building around the corner. Knowing that defendant was to appear for a preliminary hearing in a Justice of the Peace Court, the detective positioned the victim outside the courtroom where she saw defendant and others enter the room. She had been told that "possibly in the courtroom there may be a suspect or suspects." The detective then took her into the small courtroom where some 35 persons were present, including 7 to 9 prisoners all in civilian clothing. He did not sit with her. After she had been in the courtroom for about ten minutes, the detective asked if "there was anyone in the courtroom who she believe[d] . . . [was] the responsible party." She indicated the defendant, except that her assailant "did not wear any glasses or have that little fuzzy type of beard." She testified that she told the detective "that was him, but I would like to hear him talk because his speaking was still in my mind." Apparently, she also said he looked "smaller" or "thinner."

After the hearing ended the detective engaged defendant in conversation while the victim listened. When defendant spoke she "started yelling . . . and became physically upset." She "yelled, 'That is him.' . . . 'No. No. That's him.'" She was nervous and crying at the time. Defendant simply walked away from her.

At trial the victim made a positive identification of defendant as the rapist although, she said, "He is a lot thinner." During redirect-examination the prosecution, without objection, had defendant approach the witness stand and repeat the words used by the attacker: "Do as I tell you, lady, or I'll kill you and the baby." The victim then said, "You ain't going to get away with it. No, it's you. You can't change your voice."

Defendant denied any knowledge of the crime. He and his wife testified that he was at home when the attack occurred.

On these facts, identification of defendant by the victim is thus the crucial issue in the case.

## II

We first consider defendant's argument that admission of the victim's in-court identification violated his right to due process. His point is that she did not have an adequate opportunity to make the observations to which she testified, namely, that he was the rapist.

■■■■ A reliable source of information is, of course, essential to the testimony of any witness. This means that a "witness who testifies to a fact which can be perceived by the senses must have had the opportunity to observe, and must have actually observed the fact." McCormick, *Handbook of the Law of Evidence* § 10. See *United States v. Barber*, 3 Cir., 442 F.2d 517 (1971), and *United States v. Telfaire*, 152 U.S.App.D.C. 146, 469 F.2d 552 (1972).[1] But defendant's attempt to apply that principle here and deny to the victim, as a matter of law, an opportunity to make an in-court identification of defendant as her assailant is not persuasive.

---

1. Compare Rule 19 of the Uniform Rules of Evidence which provides:
   "The judge may reject the testimony of a witness that he perceived a matter if he finds that no trier of fact could reasonably believe that the witness did perceive the matter."

We recognize that the reliability-of-source requirement is most difficult to apply in controversies involving eyewitness identification and mis-identification. The case books and the commentaries are filled with the vagaries of witnesses whose identification testimony is critical to conviction. Cf. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). This case has some of the same content and, without the victim's identification, the evidence is simply inadequate to prove that defendant was the rapist.

In reviewing her testimony we emphasize that her in-court identification of defendant was positive and remained so through a long cross-examination. Unquestionably, there are weaknesses and some inconsistencies in the testimony and the statements she gave before and during trial. The jury, however, accepted her testimony and our only inquiry concerns the foundation for what she said. Did she, in fact, have the opportunity to "observe" (as *McCormick* says), or to "derive the impression" (as the Third Circuit puts it in *Barber*), or "to perceive" (in the language of the proposed Uniform Rule)? We think she did. See II *Wigmore on Evidence* (3 ed.) § 657.

The victim saw the rapist twice during the crime: first, when he stood by her bed before the assault and before he placed a blanket over her head and, second, after the attack while he was entering and/or leaving the bathroom. The bedroom light was off but there was a "glow showing" from a light in the kitchen, there was light from the bathroom when the assailant turned it on, and the dining room light was on and produced "a glow, like if a street light was on and shining through your window." She testified that she saw defendant's face "a couple of minutes" but it could have been for as brief as 30 seconds. The victim also heard the voice of her assailant before and during the attack. She testified that he was in the apartment between 10 and 20 minutes.

The victim again saw the man she identified as the rapist some two weeks after the event while he was standing in the entryway of the adjoining building.

As Justice Powell observed in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), there are "rarely witnesses to a rape other than the victim, who often has a limited opportunity of observation." That happened here. The victim was roused from sleep at night in her darkened bedroom, and for some 10 or more minutes thereafter she was undoubtedly terrified. But, like the victim in *Biggers,* she too was "no casual observer." It is clear that she saw what there was to be seen and that she listened. Her statement to the police a few hours after the assault, her subsequent statements, and her testimony during the suppression hearing and at trial confirm this. In the first statement she said that the assailant was white, "about 170, husky build and wavy hair. He had a green jacket on which resembled a Wilmington College jacket. He had black trousers on." These details and the reasonable inferences therefrom indicate that the victim had and took advantage of an opportunity to observe her assailant. The fact that defendant was thinner when the trial took place and that there are descriptive variations in her testimony and between her testimony and that of other witnesses goes to the weight of the evidence. It does not destroy the foundation for admissibility of the identification. *United States v. Barber,* supra.

We conclude that the victim's opportunities to observe, brief as they were, were sufficient to permit her to make the in-court identification. Indeed, they were not as brief in time or as fleeting in circumstance as that found admissible by the Supreme Court in *Coleman v. Alabama,*

399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970).[2]

## III

■ Next, defendant argues that he was entitled to counsel at the pre-trial observation which took place in and near the Justice of the Peace Courtroom.

The contention is governed by the opinion of the United States Supreme Court in *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Mr. Justice Stewart, in announcing the judgment of the Court, said:

"In a line of constitutional cases in this Court stemming back to the Court's landmark opinion in *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him. [Citations omitted.]

This is not to say that a defendant in a criminal case has a constitutional right to counsel only at the trial itself. The *Powell* case makes clear that the right attaches at the time of arraignment, and the Court has recently held that it exists also at the time of a preliminary hearing. . . . But the point is that, while members of the Court have differed as to existence of the right to counsel in the contexts of some of the above cases, *all* of those cases have involved points of time at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."

As in *Kirby,* no adversary proceeding or prosecution had begun against defendant; there had been no indictment, no charge, no arrest. Indeed, in *Kirby,* defendant had been arrested but, in the absence of formal charge or indictment, the Court concluded that there was still no right to counsel at a police station show-up. Here, at the critical time the detective was still, in the words of Justice Stewart, engaged in a "routine police investigation" trying to find a rapist. We conclude that defendant was not denied due process of law by what occurred during the police investigation.[3] Compare *Brokenbaugh v. State,* Del.Supr., 287 A.2d 657 (1972); *Asber v. State,* Del. Supr., 253 A.2d 204 (1969).

## IV

Finally, we consider defendant's arguments about the sufficiency of the evidence to support the conviction and the prejudicial effect of newspaper publicity.

■ The first of these is no more than a renewal of the argument based on admissibility of the victim's in-court identification. With her properly admitted sworn testimony that defendant raped her, and proof of the surrounding circumstances, the evidence is sufficient to support the verdict.

■ Turning now to the newspaper publicity, it appears that during a three-day recess in this case, local newspapers carried headlined stories relating defendant's prior conviction and the on-going trial. The *Morning News* headline over a two-column story read:

"CONVICTED STABBER NOW ON TRIAL IN RAPE CASE."

On the same day the *Evening Journal* carried a single-column story headed:

"KNIFER GOES ON TRIAL IN RAPE CASE."

It is plain that the right to a jury trial guarantees to defendant a fair trial by

**2.** Defendant relies on *Palmer v. Peyton,* 4 Cir., 359 F.2d 199 (1966), but there the conviction was based almost entirely on a voice identification made by the victim under circumstances which the Court found violated

due process. There was no facial in-court identification.

**3.** It should also be noted that no suggestion was made to the victim at any time during her observations in and out of the courtroom.

". . . impartial . . . 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Newspaper headlines such as those carried about this case illustrate how the media adds to the difficulties of a Trial Court in assuring fair trial by "indifferent" jurors, and they emphasize how important it is to constantly remind jurors to refrain from reading about the case in the newspapers during a trial. That mandate is standard in the Superior Court Handbook for Petit Jurors, and no violation has been shown here. When the news stories were called to the attention of the Trial Judge he interrogated the jurors and excused the only juror who had read a story of the trial. None had discussed stories of the trial. There was no error. *Smith v. State,* Del.Supr., 317 A.2d 20 (1974).

Affirmed.